**UNITED STATES of America,**
**Plaintiff,**

v.

**Norman Christian WOLFE, Jr.,**
**Defendant.**

**Cr. No. 34425.**

United States District Court
E. D. Michigan, S. D.

April 4, 1957.

344

Donald F. Welday, Jr., Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Hayden C. Covington, Brooklyn, N. Y., Victor F. Schmidt, Columbus, Ohio, for defendant.

FREEMAN, District Judge (from the bench).

At the conclusion of the testimony in this case the defendant moved for a judgment of acquittal, assigning a number of reasons in support of such motion, five of which reasons appear in a written motion, supplemented by what is now a total of eight oral reasons, one of which has just been stated on the record.

The motion was argued at some length by the defendant's counsel for upwards of an hour and a half, and there was a short reply argument. In presenting the argument on this motion it appears to the Court that the defendant has grouped the reasons assigned in support of the motion into, you might say, five major grounds, four of which were stated by the defendant's attorney in his summary of the argument, and one of which I think was overlooked in connection with that summary, which the Court will refer to.

The first substantial ground relied upon by the defendant in support of his motion is that the local board failed to post a list of advisors to registrants, with the names and addresses of such advisors, conspicuously in the office of

the local board, as required by Sec. 1604.-41 of the Code of Federal Regulations.

It is the contention of the defendant that the failure to post this list of advisors worked to the prejudice of the defendant in that he was deprived of having proper counsel and guidance in making a claim for a 4–D classification and also for a 3–A classification.

This point has been before the courts on more than one occasion for judicial interpretation under the facts in those particular cases.

First of all, it does appear here, and the Court will find, that there was no list of advisors conspicuously posted in the office of the local board as required by the regulations. It certainly is not a compliance with the regulations to have the list of advisors in the office, in a book, either on a desk or in a filing cabinet, or in some other place; that is not a compliance with the regulations.

Such being the case, the question is posed as to whether or not the failure to comply with the regulation worked to the prejudice of the defendant, under the facts and circumstances of this case. So far as this Court can recall the testimony, there is no showing on the part of the defendant that he went to the offices of the board after he was classified 4–D, in 1952, and prior to his classification as 1–O in 1953, in search of information, or for any other purpose.

In the three companion cases of Rowton, Wheeler and Stepp v. United States, decided by the 6th Circuit, and reported in 229 F.2d 421, 422, this question was considered by the court. In the opinion in that case the court said:

"The main contention of appellants on appeal to this court is that they were denied procedural due process of law, in that their local boards failed to post the names of advisors to registrants in the local board office as required by Section 1604.41 of the Selective Service Regulations. Appellants claim that this failure invalidates the whole process of their classification, including

their orders to report for civilian work, and their subsequent prosecutions and convictions.

Nowhere in the record do appellants actually show that the failure of the local boards to post the names of advisors worked to their prejudice in any manner. Each was afforded ample opportunity to present evidence in support of his claim to exemption from service of any kind due to ministerial status; and each did so."

And in conclusion the court said:

"The failure of the local board to post the names of advisors to registrants as required did not operate to the prejudice of these appellants. * * * They were not denied a fair and reasonable opportunity to present their claims."

■ Now, obviously the mere failure to post the list of advisors in the office of the local board is not in and of itself a denial of procedural due process; and I am considering this question from that standpoint, although I do not think that exact term was used, but that is the basis upon which the defendant has asked this court to consider this point.

In essence the Court of Appeals for this Circuit has held that the registrant must show that this failure to post the list of advisors operated to his prejudice.

Examining briefly the record in this case,—and the court must consider only the record in the case, that is, I mean the record before the local board, in arriving at a decision on this motion, particularly on this point, the failure to post a list of advisors, the Court finds that there is considerable documentary proof in the Selective Service file indicating that the defendant was not without substantial knowledge as to what was required of him in order to present his claim to deferment, or his claim for a 4–D classification. As early as January 14, 1947 the Watchtower Bible and Tract Society, Inc., which I will refer to as the Watchtower Society in this decision, wrote a letter to the Cassopolis-Michi-

gan Company of Jehovah's Witnesses advising them that the defendant in this case was a Company servant. On March 21, 1947 a similar letter was written to the Cassopolis Company, of Jehovah's Witnesses, to the effect that the defendant was then a School servant. It is not shown on the face of these documents as to just when they were filed with the local board, but I believe they were filed before the defendant was first classified.

I also find that on September 26, 1948 the defendant procured an affidavit from Mr. Waswick, who is the defendant's brother-in-law, a witness in this case, who was shown to be the Company Servant, of the Cassopolis branch of Jehovah's Witnesses organization, which affidavit pointed out that the defendant was at that time the presiding minister in Cassopolis, and a ministry school instructor, and that the defendant during the time Mr. Waswick left that territory to take another assignment was assigned to take his place, and that he was properly schooled and experienced; and the affidavit contained other information.

The Court also finds in the file a further affidavit of Clarence Erkfritz, Company Servant of the Highland Park unit, dated September 20, 1948, the substance of which is that it points out to what extent the defendant is performing religious duties and the duties of a minister. Then there also appears to be another affidavit made by Mrs. Helen Grozescu of Detroit, dated September 20, 1948, and a petition signed by a large number of individuals, between 50 and 100 I would say, attesting to the fact that the defendant here has been active as a duly ordained minister of the gospel, and a representative of the Watchtower Society, and stating among other things that he has demonstrated himself to be a qualified minister, etc. That petition is without date. Presumably it was filed before the defendant was first classified.

I also find other documentary evidence in the file appearing to be announcements of meetings and programs that the defendant would address. These are without date as to year, but there is another program attached to this exhibit that bears the year 1947. So I would assume that it was possibly 1947 or 1948 that that was filed with the board.

I also find in the file a lengthy 3-page letter written by the defendant to the local board, in the nature of an affidavit, dated September 25, 1948, wherein he sets forth his background in the ministry, and claims that his occupation is that of being a minister, and that all secular work was secondary.

I also find in the file a letter from the Watchtower Society, or rather a certificate for the defendant as a Pioneer, stating that he was appointed a Pioneer April 1, 1950.

I also find another similar instrument in the nature of a letter to the defendant dated November 1, 1953 from the Watchtower Society, to the effect that the defendant was again appointed a Pioneer.

I find that the defendant did in October 1953 file a birth certificate for each of his two children, and his marriage license.

I also find in this file that the defendant, under date of February 3, 1954, which is addressed to the state director of Selective Service at Lansing, Michigan. It starts out as follows:

"In accordance with the Selective Service regulations, Sec. 1627.1, I hereby respectfully make formal request for your taking an appeal to the President of the United States of my Selective Service classification. I make this request on the grounds the same is necessary in order to avoid an injustice, on the ground that this action is in the national interest", etc.

In that he claims to be a full-time minister. He also stated in there that he was married and subsequently had two children, and that the financial obligations and pressure of supporting a family forced him to seek outside employment. He also mentioned that the board was not informed of his marital or family status, meaning the local board, I presume.

He also wrote a letter on the same date to the Director of Selective Service in Washington, in which he starts out by quoting the section of the Selective Service regulations that permits an appeal to the Director, and refers to the section by number, section 1677.1.

On February 3, 1954, the defendant filed with the local board a summary of the case of Dickinson v. United States, reported in 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132, which was decided November 30, 1953. The defendant called this case to the attention of the local board by his memorandum to that board without date, but it was filed February 3, 1954, in which the memorandum quotes extensively from the decision in that case.

In addition to these documents I also find in the file numerous letters and exchange of correspondence between the defendant and the local board.

I have taken some time to detail this documentary proof because it appears to the court to have a direct bearing on whether or not the defendant was prejudiced in this case by a failure to post a list of advisors as required by the regulations.

It would seem to the court that the procedural steps taken by the defendant here in claiming a 4–D classification and the information submitted were quite extensive. He procured affidavits. He procured a petition. He wrote letters. He apparently was informed well enough to claim an appeal to the Appeal Board, and he cited the particular section of the regulations. He even claimed an appeal to the national Director and to the President, and cited the correct reference to the regulations. He even had at his disposal in some manner, I do not know how, the decision in the Dickinson case within a matter of about two months after the case was decided.

■ Giving full consideration to the contents of the file in this case, and particularly to the instruments the Court has referred to, and lacking other proof to show in what respect the defendant

has been prejudiced, this Court finds and concludes that the failure of the local board to post the list of advisors as required by the regulations did not operate to the prejudice of the defendant, and therefore he was not denied procedural due process of law in that respect or in that regard.

The Court is also mindful of the fact that the registrant's Selective Service card directed him to seek advice from the appeal agent. The registrant has had that card in his possession since he was registered, and he still carries it.

■ The second major ground relied upon by the defendant in his argument to the court, which apparently grouped several other specific reasons assigned in support of the motion, was to the effect that an error of law was committed by all of the boards having to do with the classification of the defendant as to what constituted a minister under the law and regulations entitling the defendant to a 4–D classification. First of all I turn to the statute in this case, which is Sec. 456(g), Title 50 U.S.C.A. Appendix, which provides in part as follows:

> "Regular or duly ordained ministers of religion, as defined in this title, and students preparing for the ministry under the direction of recognized churches or religious organizations, who are satisfactorily pursuing full-time courses * * * shall be exempt from training and service, (but not from registration) under this title."

I do not recall that the statutory definitions were presented in connection with the arguments in this case, but the definitions as set forth in the regulations were read to the court, which regulations are Sections 1622.43 (B–1, 2 and 3).

Insofar as I can see, the definitions of a duly ordained minister of religion, regular minister of religion, and a regular or duly ordained minister of religion, as set forth in the regulations I have just referred to, are also set forth in

the statute at Section 466(g) (1-3), Title 50 U.S.C.A.Appendix.

The leading case on this point is a case that has been referred to to some extent in the arguments as the Dickinson case, the case of Dickinson v. United States, reported in 346 U.S. 389, 74 S.Ct. 152, 154, 98 L.Ed. 132. The Court there stated:

"The principal and decisive issue before us is whether there was a basis in fact for denying Dickinson's claim to a ministerial exemption under § 6(g) of the Universal Military Training and Service Act."

I will consider that to be the issue here on this point, whether or not there was a basis in fact on the part of the local board for denying the defendant a 4-D classification here.

As I recall the testimony here, the defendant was classified 1-A on December 2, 1948, from which he appealed, apparently; and on March 22, 1949 the defendant was also again classified or continued in class 1-A by the appeal board. On July 28, 1950 the defendant was classified 4-D, and that classification continued until he was classified 1-O on October 2, 1953, following which classification the defendant demanded a personal appearance before the board, which was granted to him, and which was held November 6, 1953.

It also appears that the defendant appealed from this 1-O classification, which classification was sustained by the appeal board and also by the national board, the so-called Presidential Board, I believe it is sometimes referred to. The action of the President's appeal board was given on March 16, 1954.

It appears, in connection with the documents that I have already read in this record, that on April 1, 1950 the defendant was appointed a Pioneer Minister, which I understand, though I do not know whether it appears from the testimony in this case, but I think it is recognized that a Pioneer Minister is one who spends at least 100 hours a month in the ministry of the Watchtower Society.

On November 1, 1953 the defendant was again appointed a Pioneer Minister. So, it would appear from that that there must have been an intervening time there when the defendant was not serving as a Pioneer Minister.

It also appears from the record in this case that the defendant was employed full-time at secular work, or rather was employed in secular work at a full-time job, from some time in 1952 until on or about November 1, 1953. He was employed by the Westwood Products Company, a corporation owned by the defendant's father, his sister and his brother-in-law; they were the stockholders; his father owned half the stock. The defendant's job was that of purchasing agent, or some similar position, a procurement official of some kind. In that capacity, during that time, the defendant earned a salary of $7,500 a year.

It would appear that the defendant during that time was not engaged in the ministry as his principal occupation. I think the testimony shows he was still doing some work in the church, teaching, etc. But in spite of that full-time occupation at that salary he nevertheless continued to enjoy a 4-D classification, and continued to so enjoy that classification for more than a year, at least until October 2, 1953, when he was reclassified as 1-O.

The defendant also had in his possession his draft card, which card carried a note of warning that he should report any change of circumstances to the board.

He did not report that condition to the board, and he continued to enjoy his 4-D classification. Then it seems that some time prior to August 25, 1953, the President issued an order for a review of these 4-D classifications. And in that connection a regulation was adopted which provided:

"In Class 3-A shall be placed any registrant who prior to August 25, 1953, has submitted evidence to the local board which establishes to the satisfaction of the local board that

he has a child or children with whom he maintains a bona fide family relationship in their home."

That is, in part, Section 1622.30 of the regulations.

This seems to have been a part of one over-all consideration by the President at that time, in the summer of 1953.

Pursuant to that order the defendant's classification was re-examined by the local board, and on October 2, 1953 he was reclassified as 1–O, which is that of a conscientious objector.

It is also significant that at some earlier date, the defendant had filed an application on a special form with the local board, on February 21, 1951, wherein, in effect, he claimed that he was entitled to such a classification; at least he stated on the first page of the form that he was conscientiously opposed to participation in war because of his religious training and belief, and further that he was conscientiously opposed to participation in noncombatant training or service in the armed forces. He goes on to say there that he claimed exemption from combatant training and service. He further states that if his claim is sustained he understands that he will, because of his conscientious objection to noncombatant service in the armed forces, be deferred as provided in Section 6 (k) of the Selective Service Act of 1948.

After the defendant was classified 4–D he filed that form on February 21, 1951; and in that connection the defendant sets out his membership in the Jehovah's Witnesses Watchtower Society organization, and attached to it a Watchtower magazine which would fully explain the views of the organization, also giving some other information.

This was a special form for conscientious objectors.

As a matter of fact, the record in this case shows that at the time the defendant was reclassified 1–O on October 2, 1953, he was still then working full-time, earning $7,500 a year, in this so-called family enterprise.

It also appears that he had under consideration at some time in the future making the ministry his principal occupation again, and cutting down his secular work, at least to the extent that he could provide for himself and family. But this was accelerated and actually brought into being as the result of the defendant being reclassified, it appears, because I think he said he was aiming at about the first of the year 1954 making this change, but in view of the change in his classification he decided to do it promptly. On November 1 it appears that he took part-time employment with the same company. In taking part-time employment, he still continued to work four hours a day. At least, he was paid on that basis. In other words, after November 1 he received a salary of $3,750 a year, and he was paid monthly.

The testimony is not too clear as to just how his duties differed after he took this salary cut from what they were before. Either as a full-time employee or as a part-time employee, the defendant was not required to keep regular hours at his job. He was free to come and go, to some extent, as he pleased. As I recall the testimony in this case, the only substantial change when he began earning the half-salary of $3,750 a year was that the defendant was relieved of performing certain clerical work thereafter. $3,750 a year is a substantial sum of money; it is not just a nominal amount. Of course, $7,500 a year, which he was earning prior to the time he was reclassified from 4–D to 1–O was a substantial sum of money. As a matter of fact, there is no question that from the time the defendant went to work for the Westwood Company in 1952 until November 1, 1953, that was his principal vocation, and the Court finds that it was his principal vocation, and he earned a substantial salary at that vocation. Even on November 1, 1953 the defendant continued to earn a substantial salary. It is questionable whether he could have continued to have had such employment at those wages except that perhaps it was a fam-

ily enterprise. Nevertheless, at the time the local board classified the defendant 1–O, on October 2, 1953, there was no evidence before the board that the defendant was other than employed full time at secular work, from which the Court finds that his secular work during that time was his regular vocation.

I desire at this point to refer to the Dickinson case, and quote from that opinion rather briefly:

"At the outset it is important to underline an elemental feature of this case. The Universal Military Training and Service Act does not permit direct judicial review of selective service classification orders. Rather the Act provides, as did the 1917 and 1940 conscription Acts before it, that classification orders by selective service authorities shall be 'final.' However, in Estep v. United States, 1946, 327 U.S. 114, at pages 122–123, 66 S.Ct. 423, at page 427, 90 L.Ed. 567, a case arising under the 1940 Act, this Court said: 'The provision making the decisions of the local boards "final" means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant'.

"The ministerial exemption, as was pointed out in the Senate Report accompanying the 1948 Act, 'is a narrow one, intended for the leaders of the various religious faiths and not for members generally.' * * * Each registrant must satisfy the Act's rigid criteria for the exemption. Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption."

*   *   *   *   *   *

" * * * If the facts are disputed the board bears the ultimate responsibility for resolving the conflict—the courts will not interfere. Nor will the courts apply a test of 'substantial evidence.' "

Of course, in the Dickinson case the court held that there was no basis in fact for the board's refusal to give the defendant a 4–D classification because of the facts involved. But the facts in this case are not the facts in that case, and neither did the board have before it, at the time this reclassification was considered, all of the evidence which the defendant claims that the board should have taken into consideration. At the personal appearance on November 6, 1953 the defendant stated to the board on that occasion that he had been working in the past full-time, and that his ministerial work may be incidental to his work, but he considers his ministerial work is his vocation, and that it has been his regular work for the last fifteen years.

That is not an accurate statement, under the evidence in this case, because it shows that the defendant was regularly employed full-time by the Westwood Company from the time it was organized in 1952 until November 1, 1953.

He also stated at that time and submitted to the local board a letter from his brother-in-law to the effect that he was then on a part-time basis, working half days for Westwood; and he went on to say that he was not doing this to be evasive. But the action of the local board in reclassifying him from 4–D to 1–O

did force his hand. The board concluded, after listening to the defendant and talking with him on that occasion, that he was not entitled to a further change in classification.

This Court has given a great deal of thought to this case and has spent several hours reviewing the testimony and considering the law, as I have already stated on the record here. Having thoroughly examined the record, and also having examined the law, this Court concludes that the defendant here has not met the burden of clearly establishing the right to his exemption as a 4–D classification. This Court is unable to find that there was no basis in fact for the classification of the defendant in class 1–O which was given him, and which was sustained on appeal to the appeal board, and by further appeal to the Presidential board.

Therefore, the Court also finds that the local board and appeal board and Presidential board did not act without basis in fact, or arbitrarily or capriciously, or contrary to law, when they refused to give the defendant a 4–D ministerial classification, under the circumstances in this case.

The third major ground for the defendant's motion is that all of the boards having to do with the classification of the defendant erred because the defendant was entitled to a 3–A or a 4–D classification, and the boards did not give sufficient consideration to such reasons for such classification.

I think that what I have already said will dispose of his contention insofar as the claim for a 4–D classification is concerned.

However, this brings up the question of whether the defendant should have been entitled to a 3–A classification. The Court has examined the record in this case, and nowhere does the Court find that the registrant, defendant here, did claim a 3–A classification, or did he claim such a classification in substance. In that respect the Court, first of all, refers to Section 1622.30 of the Regulations, which I have already read, which in substance provides that "in class 3–A shall be placed any registrant who prior to August 25, 1953 has submitted evidence to the local board which establishes to the satisfaction of the local board that he has a child or children with whom he maintains a bona fide family relationship in their home. Such a registrant shall remain eligible for class 3–A so long as he maintains a bona fide family relationship with such child or children in their home."

It is admitted here that the defendant did not provide the local board or submit to the local board evidence that he had a child or children with whom he maintains a bona fide family relationship in the home prior to August 25, 1953. I interpret this regulation as to bind the board and make them powerless to accept evidence filed later. I believe the record in this case shows that the defendant did submit such evidence about September 4, 1953. Nevertheless, this is a regulation bearing a fixed date, and the board felt obliged to follow it.

Examining the testimony, it appears that during this time the defendant was enjoying a 4–D classification. Of course, there is no direct evidence, but I think it might be a fair inference from this evidence that the defendant relied on that 4–D classification, and felt secure in that classification, and therefore he did not submit this evidence. I think there is testimony in the record here that there was quite some widespread publicity advising registrants to submit such evidence on or before this date. Insofar as this record shows, that was the only notification given to registrants.

Whether or not the defendant actually saw this request for the filing of such information, at least the information was given some publicity, and he did not take advantage of it.

I also have in mind, in disposing of this point, in view of the argument of counsel, that the defendant now claims the board should have placed him in class 3–A because of a hardship within the

meaning of the Regulation 1622.30(d), which provides in part as follows:

"In class 3–A shall be placed any registrant whose induction into the armed forces would result in extreme hardship and privation, (1) to his wife, divorced wife, child, parent", etc.; "(2) to a person under 18 years of age, or a person of any age who is physically or mentally handicapped", etc.

It is the claim of the defendant that at the time he was reclassified 1–O he was then a husband and a father. It is his contention here that that should have been enough to put the board on notice that there was a possible hardship involved, and that they should have made some inquiry into that. In any event, there was no evidence of hardship submitted to the board by the defendant. Even at the hearing on November 6, 1953, the defendant presented no evidence of hardship. It was directed to the attention of the board that the defendant was married, and had a wife and two children to support, and he had his car to finish paying for.

It may be that the defendant did not press that claim vigorously at that time inasmuch as he was more interested in trying to get a 4–D classification. I think that was the case. In any event, there was no evidence before the board, on the record in this case, of hardship within the meaning of the regulation which the Court has just read. And therefore, under the evidence and the law applicable to this particular point in regard to a 3–A classification, the Court finds no error on the part of the board. The Court finds that none of the boards who considered this matter, including the appeal boards, erred with respect to this claim.

There is a further claim made by the defendant, in summary which can be referred to as discrimination. During the trial there was some point made of a remark made by one of the members of the local board which would indicate discrimination. But I think the defendant's principal emphasis on this point was that the board did defer and place in class 3–A many other individuals, registrants, who were in circumstances similar to the defendant with respect to family status, being married and having children. Again, that in and of itself does not indicate or prove discrimination. Discrimination is referred to in the regulations, Section 1622.1, subdivision (d), which provides as follows:

"In classifying a registrant, there shall be no discrimination for or against him because of his race, creed or color, or because of his membership or activity in any labor, political, religious or other organization. Each such registrant shall receive equal justice."

■ This Court is unable to find, on the evidence in this case that was before the board, any discrimination within the meaning of that regulation.

■ There was a fifth major point argued and presented to the court by counsel for the defendant, which was not mentioned in the summary of his argument, but which the Court will consider because I think it was argued, and that was that the local board committed an error in refusing to reopen the defendant's case or classification at the hearing in May of 1954.

Regulation 1625.2 provides in part as follows:

"The local board may reopen and consider anew the classification of a registrant, (1) upon the written request of the registrant, the Government appeal agent, any person who claims to be a dependent of the registrant, or any person who has on file a written request for the current deferment of the registrant, in a case involving occupational deferment, if such request is accompanied by written information presenting facts not considered when the registrant was classified, which, if true, would justify a change in the registrant's classification; or (2) upon its own motion, if such action is based upon facts not considered

when the registrant was classified, which, if true, would justify a change in the registrant's classification."

At the hearing on May 4, 1954, it is the claim of the defendant that he then and there made a request to reopen his classification within the meaning of this regulation. As a matter of fact, the meeting was not called for that purpose at all. In the first place, the meeting was called by the local board to consider the type of civilian work to be performed by the defendant. The reason for the meeting was stated by Col. Stahl, at the outset of the meeting; after some discussion, in which the defendant admitted having previously received a list of positions open in Michigan of "civilian work" within the meaning of the law, and also acknowledged that he had refused to accept any such position; and as a matter of fact, he stated that any position shown in the letter sent to him by the local board, with respect to such civilian work, he refused to accept. He also stated that he knew the penalty for not obeying the order of the local board. He also said that he would refuse to go into a hospital and do work of national importance; and he stated that there was only one way that he had a chance to challenge the classification that the local board had given him, and that was in the courts of the land. He stated on that occasion that there was no point of argument at that time, that he was not afraid of work, but he would not accept this work.

Then an informal discussion followed the regular meeting, at the opening of which the defendant said, "I would like to ask the local board and Mr. Ibbotson, the chairman, to reopen and consider my case." Then, after some discussion, the chairman asked him why he thought it should be reopened, and this was his response: "Well, I feel that the information that has been handed down by the Supreme Court has been overlooked by the local board. I mean a few passages. I realize that taking them out of context may change the meaning a little."

He then quoted from the Dickinson case transcript that he had. I have already referred to that transcript which was submitted to the local board. It appears in the request to reopen his classification that the defendant was simply asking the board to consider the effect of the Dickinson case and to apply that to the facts in his case. He apparently felt that the board had not followed the Dickinson case. He did not submit any new evidence; he did not make any claim that he had additional facts or additional evidence that the board had not previously considered. His request to reopen was not in writing. Even his oral request was not accompanied by any information, oral or written, presenting facts not considered when the registrant was classified, which, if true, would justify a change in his classification.

In the case cited by the defendant in his written motion, United States v. Ransom, reported in 7 Cir., 223 F.2d 15, 16, that was also a conscientious objector case, in which the defendant has asked to be classified 4–D. In the opinion in that case the court said:

"Shortly after his file (the registrant's file) was returned to the local board, the defendant was appointed a 'pioneer' minister of his church and he forwarded the letter so notifying him to the local board, and asked that his classification be reopened. The board refused to reopen, saying that this was not 'new evidence'. The defendant then appeared before the board in person, called attention to the new material in his file, told the members that he was spending 100 hours per month 'preaching,' and asked that they therefore reopen his classification. The board refused to do so", etc.

That is an entirely different situation than we have here where the registrant, in connection with his request to reopen his case, called no new facts or evidence to the attention of the board, and merely asked the board to consider the Dickinson case.

354

Therefore, this Court finds that no error was committed by the local board in refusing to reopen the case. For the reasons the Court has now given, the motion for acquittal is denied.